IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

IN RE: BK 12-80774

PHILIP A. GEDDES and
CYNTHIA P. GEDDES,

    Debtors.

## MEMORANDUM OPINION

This case came before the court on July 25, 2012, for hearing on Wells Fargo Bank, National Association's ("Movant") Motion to Dismiss, or, in the Alternative, to Convert to Chapter 11 With Debtors' Consent ("Motion to Dismiss") and Debtors' Objection to Motion to Dismiss.[1] Glenn E. Glover and T. Parker Griffin, Jr. appeared on behalf of Movant; Valrey W. Early, III appeared on behalf of Debtors. After consideration of the evidence and the arguments of the parties, this court **SUSTAINS** the Debtor's Objection to the Motion to Dismiss and **DENIES** the Motion to Dismiss.[2]

## FINDINGS OF FACT

Philip A. Geddes ("Debtor") is a licensed, practicing attorney. He has been the Standing Chapter 13 Trustee in the Bankruptcy Court for the Northern District of Alabama, Northern Division since first being appointed to that position in 1979. He also runs a private law practice.

Debtor decided to branch out from his legal career and formed Enviromate, LLC

---

[1] Movant's Motion to Extend Deadline to Object to Debtor's Discharge or to Challenge Dischargeability of Certain Debts ("Motion to Extend"), and Debtors' Objection to Motion to Extend was also set for hearing on July 25, 2012. However, the parties indicated at the hearing that they would wait to argue the Motion to Extend until after the court ruled on the Motion to Dismiss. This court will set the Motion to Extend for hearing by separate order.

[2] The following opinion deals only with the Movant's allegations of bad faith against Phillip A. Geddes as the Movant did not allege that Cynthia P. Geddes acted in bad faith. Even if this court had been inclined to grant the Motion to Dismiss as to Mr. Geddes, such motion would have been denied as to Mrs. Geddes.

1

("Enviromate") in 2000.³ Enviromate owns a plant site in Moulton, Alabama. The plant sits on about nine acres of land, and the building comprises about 50,000 square feet. (Movant's Exhibit 5). Enviromate began manufacturing cellulose insulation in 2004. The manufacturing operations of Enviromate ceased in October 2009.⁴ Between 2007 and 2009, Movant made three separate loans to Enviromate in the respective amounts of $309,646.60, $330,421.00, and $200,000.00 ("Enviromate Loans"). (Movant's Exhibit 1). Debtor personally guaranteed the Enviromate loans. Monthly payments on the Enviromate Loans ceased in September 2009, around the same time that Enviromate ceased operations.

Although Debtor could not afford to continue to make the roughly $8,000.00 per month payments to Movant once Enviromate ceased operations, Debtor did continue to make payments to other creditors. Debtor continued to pay NORCOG $800.00 per month until he filed this bankruptcy petition. NORCOG holds the second mortgage on the collateral securing the Enviromate Loans. In addition, Debtor testified that he made payments on equipment and continued to pay for the upkeep of the building so these things would retain their value if a buyer was found that was interested in purchasing Enviromate as a going-concern. Debtor further testified that he continued to make payments to Ford Motor Credit from whom Enviromate had leased roughly 60 trailers to deliver the cellulose insulation, that he continued to make payments to Regions Bank where he was obligated on a line of credit, and that he continued to make payments to American Express on a line of credit. Debtor further testified that he continues to make ongoing payments to Progress Bank in the amount of $1,500.00 per month. The payment to Progress Bank is reflected on Debtor's Schedule J. (Bk. Doc. 1).

On May 19, 2011, Movant commenced a cause of action against Enviromate and Debtor in the United States District Court for the Northern District of Alabama ("District Court action")

---

³Debtor is the sole member of Enviromate.

⁴Cellulose insulation goes into either home construction or commercial construction. When the housing market crashed in 2008, Enviromate lost many of its customers.

2

seeking a money judgment for the amounts due on the Enviromate Loans.[5] (Movant's Exhibit 2). Debtor and Enviromate filed a counterclaim in the District Court action, and such counterclaim was dismissed on September 27, 2011.[6] (Movant's Exhibit 2). Debtors filed a voluntary bankruptcy petition pursuant to Chapter 7 of the United States Bankruptcy Code on March 7, 2012. (Bk. Doc. 1). A Suggestion of Bankruptcy was filed in the District Court Action on March 14, 2012, which stayed the District Court action as to Debtor. (Movant's Exhibit 2). On June 5, 2012, final judgment was entered against Enviromate in the District Court action. (Movant's Exhibit 3). No judgment has been entered against the Debtor. Movant has taken no steps to foreclose on the collateral securing the Enviromate Loans.

As stated above, Debtor filed a voluntary bankruptcy petition pursuant to Chapter 7 on March 7, 2012. (Movant's Exhibit 4). Debtor is a non-consumer debtor, as his debts are not primarily consumer debts. (Bk. Doc. 51). Movant filed this Motion to Dismiss on June 5, 2012, asserting that Debtor's Chapter 7 bankruptcy should be dismissed "for cause" pursuant to 11 U.S.C. § 707(a).

## CONCLUSIONS OF LAW

Movant seeks the dismissal of Debtor's case "for cause" pursuant to 11 U.S.C. § 707(a).[7]

---

[5] Movant commenced the District Court action roughly 17 months after first sending a formal demand letter for payment on the Enviromate Loans.

[6] Movant pointed to the Order which denied without prejudice Movant's Motion to Dismiss in the District Court Action as evidence that Debtor has continually acted in bad faith. Specifically, Movant pointed to the following paragraph contained in the Order: "Although the court cannot consider the packet of extrinsic evidence supporting [Movant's] argument, it is concerned by the evidence before it and the implications for the Counterclaim Plaintiff. If, after discovery, it turns out that [Movant] is correct in its contentions contained in the Motion to Dismiss, and the Counterclaim is as frivolous (and potentially could be characterized as malicious) as the evidence suggests, the court will gladly entertain a motion for sanctions under Federal Rule of Civil Procedure 11(b), including, but not necessarily limited to, any and all attorneys fees and costs [Movant] expends from this point forward to defend against such a claim."(Movant's Exhibit 21). While Movant is correct that this language causes concern, the District Court made no findings of wrongdoing; the District Court merely stated that if the conduct alleged by Movant was proven true at a later date, after discovery, Debtor and Enviromate would be subject to sanctions. This court does not consider the Order evidence of Debtor's bad faith.

[7] Movant cannot seek dismissal pursuant to § 707(b) because Debtor's debts are not primarily consumer debts. See 11 U.S.C. § 707(b)(1).

3

Case 12-80774-CMS7    Doc 75    Filed 12/07/12    Entered 12/07/12 12:51:13    Desc Main
Document    Page 3 of 17

Specifically, Movant asserts that Debtor has acted in bad faith and that bad faith constitutes cause to dismiss pursuant to § 707(a). Section 707(a) provides:

> The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including-
> (1) unreasonable delay by the debtor that is prejudicial to creditors;
> (2) nonpayment of any fees or charges required under chapter 123 of title 28; and
> (3) failure of the debtor in a voluntary case to file, within fifteen days, or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee.

11 U.S.C. § 707(a). Although bad faith or lack of good faith[8] is not one of the enumerated reasons to dismiss a Chapter 7 bankruptcy case, the enumerated reasons are "illustrative and not exhaustive." In re Padilla, 222 F. 3d 1184, 1191 (9th Cir. 2000). See also Indus. Ins. Servs. v. Zick (In re Zick), 931 F. 2d 1124, 1126 (6th Cir. 1991) (stating that the court is "satisfied that the word 'including' is not meant to be a limiting word"); 11 U.S.C. § 102(3) (providing that "'includes' and 'including' are not limiting"). There is a split of authority over whether bad faith constitutes "cause" for dismissal under § 707(a), and this court has not yet addressed the issue. Compare In re Padilla, 222 F. 3d at 1192-93 (concluding that "bad faith per se can properly constitute 'cause' for dismissal of a Chapter 11 or Chapter 13 petition but not of a Chapter 7 petition under § 707(a)"), with In re Zick, 931 F. 2d at 1127 (stating that "lack of good faith is a basis for dismissal under § 707(a)"). Because Debtor conceded at the hearing that bad faith does constitute "cause" for dismissal under § 707(a), this court will leave the issue open and find, for purposes of ruling on the instant Motion to Dismiss, that bad faith does constitute "cause" for dismissal under § 707(a).

Bankruptcy courts have developed a list of factors relevant to the determination of whether a debtor has acted in bad faith:

(1) The debtor reduced his creditors to a single creditor shortly before the petition date;

(2) The debtor made no lifestyle adjustments or continued living a lavish lifestyle;

---

[8]The terms "bad faith" and "lack of good faith" will be used interchangeably throughout this opinion.

4

(3) The debtor filed the case in response to a judgment, pending litigation, or collection action;

(4) There is an intent to avoid a large, single debt;

(5) The debtor made no efforts to repay his debts;

(6) The unfairness of the use of Chapter 7;

(7) The debtor has sufficient resources to pay his debts;

(8) The debtor is paying off insiders;

(9) The schedules inflate expenses to disguise financial well-being;

(10) The debtor transferred assets;

(11) The debtor is over-utilizing the protections of the Bankruptcy Code to the unconscionable detriment of creditors;

(12) The debtor employed a deliberate and persistent pattern of evading a single major creditor;

(13) The debtor failed to make candid and full disclosure;

(14) The debtor's debts are modest in relation to his assets and income; and

(15) There are multiple bankruptcy filings or other procedural "gymnastics."

In re Baird, 456 B.R. 112, 116-17 (Bankr. M.D. Fla. 2010). This court will address each factor separately.

**1. Did Debtor reduce his creditors to a single creditor shortly before the petition date?**

No. Movant is not Debtor's only creditor. Debtor has several legitimate creditors, as reflected on Schedule D and Schedule F filed with the bankruptcy petition, including BBVA Compass, Progress Bank, Regions Bank, and various credit card companies.

**2. Did Debtor fail to make lifestyle adjustments or continue to live a lavish lifestyle?**

No. Debtor's schedules show that he and his wife own the following property: Homestead real property worth $457,000, antique furniture worth $12,000, jewelry worth $7,750, a 2005 Ford Explorer worth $4,000, and a 1998 Mercedes Benz worth $500. No retirement account was listed on Schedule B. In addition, Debtor testified that he and his wife had not taken a vacation in years.

5

Case 12-80774-CMS7    Doc 75    Filed 12/07/12    Entered 12/07/12 12:51:13    Desc Main
Document    Page 5 of 17

This does not constitute a lavish lifestyle, especially when Debtor's high income is taken into consideration.

**3. Did Debtor file this case in response to a judgment, pending litigation, or collection action?**

Yes. Debtor filed this bankruptcy petition on the date he was supposed to give a deposition in the District Court Action. Furthermore, Debtor testified that he filed this bankruptcy petition to avoid a judgment being entered against him in the District Court action.

**4. Did Debtor intend to avoid a large, single debt?**

No. Movant's debt comprises roughly 75% of the total unsecured debt listed in Debtor's bankruptcy petition. However, this does not mean that obtaining a discharge of Movant's claim is the sole reason Debtor filed this bankruptcy petition. Debtor has other debts which are due to be discharged. In addition, it is clear to this court that Debtor filed bankruptcy because he could not afford to make the payments on the loans of Enviromate that he personally guaranteed when Enviromate ceased to operate. Debtor filed this bankruptcy petition to discharge the business loans he personally guaranteed; it just so happens that Movant holds most of those loans.

**5. Did Debtor make an effort to repay his debts?**

Yes. Although Debtor could not afford to continue to make the roughly $8,000.00 per month payments to Movant once Enviromate ceased operations, Debtor did continue to make payments to other creditors. Debtor continued to pay NORCOG $800.00 per month until he filed this bankruptcy petition. NORCOG holds the second mortgage on the collateral securing the Enviromate Loans. In addition, Debtor testified that he made payments on equipment and continued to pay for the upkeep of the building so these things would retain their value if a buyer was found that was interested in purchasing Enviromate as a going-concern. Debtor further testified that he continued to make payments to Ford Motor Credit from whom Enviromate had leased roughly 60 trailers to deliver the cellular insulation, that he continued to make payments to Regions Bank where he was obligated on a line of credit, and that he continued to make payments to American Express on a line

6

of credit. Debtor further testified that he continues to make ongoing payments to Progress Bank in the amount of $1,500.00 per month. The payment to Progress Bank is reflected on Debtor's Schedule J. While Debtor was making payments to these creditors, he was also searching for a buyer who would purchase the Enviromate plant as a going concern. Debtor was unable to do so, although he was able to find someone willing to lease the property for 5 years at the rate of $8,000 per month. Unfortunately, that deal fell through.

It is clear from the testimony that Debtor was doing everything he could to remain current on all of his bills. He made a determination that it was best to not pay Movant so he could remain current on all of his other bills. Although Debtor was not making payments to Movant, he was actively trying to repay them: he was searching for a buyer for the Enviromate facility. Debtor made efforts to repay his debts prior to the filing of this bankruptcy petition.

**6. Has Debtor unfairly used the provisions of Chapter 7 of the Bankruptcy Code?**

No. Debtor has not unfairly used the provisions of Chapter 7 of the Bankruptcy Code.

**7. Does Debtor have sufficient resources to pay his debts?**

No.[9] Schedule I shows that Debtor receives $12,000.00 in monthly gross income from his position as Standing Chapter 13 Trustee as well as $1,900.00 in pension/retirement income for a total

---

[9] Because Debtor does not have sufficient resources to pay his debts, the court need not determine whether it is appropriate to consider Debtor's financial situation in determining whether to dismiss a case pursuant to § 707(a). The legislative history to § 707(a) makes it abundantly clear that a case cannot be dismissed based upon this factor alone: "[Section 707(a)] does not contemplate, however, that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal. To permit dismissal on that ground would be to enact a nonuniform mandatory chapter 13, in lieu of the remedy of bankruptcy." H.R. REP. NO. 595, at 380 (1977); S. REP. NO. 989, at 94 (1978). There is a split of authority regarding whether a debtor's ability to pay is to be considered at all. See, e.g., In re Kahn, 172 B.R. 613, 624 (Bankr. D. Minn. 1994) ("In passing on a motion for dismissal under § 707(a), then, the Bankruptcy Court should exclude any consideration that goes to the debtor's financial means. It cannot make judgment pronouncements that the debtor really should be paying his or her debts rather than seeking refuge in bankruptcy liquidation."); In re Perlin, 497 F. 3d 364, 372 (3rd Cir. 2007) ("While the legislative history makes clear that a debtor's ability to repay his debts is inadequate cause for dismissal, we do not read the history as prohibiting a bankruptcy court from considering a debtor's substantial income and expenses in determining whether the debtor filed his bankruptcy petition in good faith.").

monthly gross income of $13,900.00.[10] (Movant's Exhibits 4). Schedule I does not show that Debtor receives any income from his private attorney practice. That is consistent with Debtor's testimony at the § 341 Meeting of Creditors, where he testified that he "hadn't sent anybody a bill in probably five years." (Movant's Exhibit 5).

Schedule J shows that Debtor expends the following on a monthly basis: $2,627.00 on mortgage payment;[11] $500.00 on electricity; $50.00 on water and sewer; $230.00 on telephone; $250.00 on home maintenance; $625.00 on food; $200.00 on clothing; $50.00 on laundry and dry cleaning; $250.00 on medical and dental expenses; $200.00 on transportation; $1,000.00 on recreation; $177.00 on life insurance; and $2,625.00 on regular expenses from the operation of a business. The expenses shown on Schedule J total $8,784.00, which when subtracted from Debtor's gross monthly income of $13,900.00, indicate that Debtor has $5,116.00 in monthly disposable income.

Schedule J instructs debtors to attach a detailed statement if a debtor lists any regular expenses for the operation of the business. Debtor did not attach a detailed statement. At the §341 Meeting of Creditors, Debtor testified that the $2,625.00 in expenses are expenses that he incurs in his private practice, not expenses that he incurs as the Chapter 13 Standing Trustee. Debtor testified that $2,625.00 is "about what it cost me to buy my bar license, to get software, buy computers, stuff like that, travel." (Movant's Exhibit 5). Movant requested more detailed information, so Debtor put together a spreadsheet detailing all of the professional expenses he incurred in 2011, which totaled $36,740.71. (Movant's Exhibit 10). The major expenses are as follows: $1,764.15 recurring monthly cell phone charges; $11,000.00 to Curtis Whitney Holdings; $5,500.00 to Tony Varner, the President of Curtis Whitney Holdings; $5,153.59 to Jahidi White, which Debtor classifies as

---

[10]Debtor's wife is a homemaker and does not receive any income.

[11]Schedule A shows that the value of Debtor's home is $457,000.00 and that the home was subject to a mortgage in the amount of $445,000.00. (Movant's Exhibit 4). The Chapter 7 Individual Debtor's Statement of Intention indicates that Debtor intends to reaffirm the debt. (Movant's Exhibit 4).

8

business development/client development expenses; $2,515.00 to Shontal Harris; $575.00 to Mike Forehand, which Debtor classifies as business development/client development expenses; $5,000.00 was taken out in cash for Debtor's trip to Africa to get a deal together on one of the African Projects.[12] Although Debtor is unable to estimate with reasonable certitude what his business expenses will be going forward, the business expenses of the previous year can act as a reasonable estimation of the business expenses of the next year. Therefore, this court will project that Debtor's 2012 business expenses will closely follow Debtor's 2011 business expenses, minus the $5,000.00 in cash that was taken out for Debtor's trip to Africa. The other expenses constitute minor expenses for items like books, shipping costs, and bar dues. The $31,740.71 in business expenses equates to $2.645.06 per month, $20.06 more than listed on Schedule J. This brings Debtor's monthly disposable income down to $5,095.94.

Debtor did testify that the cost of his bond has increased dramatically since the filing of this bankruptcy petition. Debtor's position as a Standing Chapter 13 Trustee requires him to have a bond. Before the filing of this petition, Debtor qualified for a normal bond which costs $6,000.00 per year. After the filing of this petition, Debtor only qualifies for a special bond which costs $34,000.00 per year. While the expense of the $6,000.00 bond is still being paid as an expense by the Chapter 13 office, Debtor must pay the remaining balance on the bond personally. Therefore, Debtor is paying $28,000.00 more per year for his bond than he was pre-petition. This increases his monthly business expenses by $2,333.33, decreasing his monthly disposable income to $2,762.61.

While $2,762.61 in disposable income may sound like a lot, Debtor has large unsecured debt:

---

[12]Movant takes issue with the classification as business expenses of the payments made to Tony Varner, Jahidi White, and Mike Forehand. Debtor testified that Tony Varner was "part of the team" and that he gave money to Tony when he needed it so that Tony would hopefully pay him if any of the African Projects came to fruition. Debtor further testified that Jahidi White is an ex-NBA basketball player he knows who is trying to help him get business and that he helps Jahidi with bills occasionally. Jahidi has referred a few business transactions and a few large real estate transactions to Debtor, but they have been too big for Debtor to handle. Debtor further testified that Mike Forehand sells insurance and he represents athletes. Debtor also helps Mike out when Mike needs it in the hopes that Mike will refer clients to Debtor in the future.

9

Case 12-80774-CMS7    Doc 75    Filed 12/07/12    Entered 12/07/12 12:51:13    Desc Main
Document      Page 9 of 17

$1,218,019.24 in general unsecured debt to be precise. If Debtor was to pay all of his monthly disposable income toward paying his general unsecured debt, it would take him 441 months, or 37 years, to pay off the debt. Another way of looking at it is that Debtor would pay $165,756.60 to general unsecured creditors in a 60 month Chapter 11 plan. This constitutes a 14% dividend to general unsecured creditors. Debtor does not have sufficient income to pay his debts. In addition, Debtor does not have nonexempt, unencumbered assets from which a distribution to unsecured creditors could be made. In short, Debtor does not have sufficient resources to pay his debts.[13]

### 8. Is Debtor paying debts of insiders?

Debtor paid the debts of insiders prepetition, but there is no evidence that Debtor is making these payments postpetition. Because Enviromate is a corporation which Debtor controls, Enviromate is an insider of Debtor. 11 U.S.C. § 101(31)(A)(iv). Debtor paid debts of Enviromate prepetition. However, this does not favor dismissal in this case. As discussed in detail above, Debtor was doing everything he could to keep current on all of the Enviromate debts except for the debt owed to Movant. Because Debtor could not afford the monthly $8.000.00 payment owed to Movant, Debtor was instead searching for a buyer for the Enviromate collateral. There is no bad faith here-just a decision as to how to best allocate limited resources.[14] Plus, it should be noted that

---

[13] This court only considered the income and assets of Debtor when determining whether he had sufficient resources to pay his debts. In other words, this court did not consider the assets of Enviromate. Debtor is the sole member of Enviromate and Enviromate owns a manufacturing plant which acts as the collateral on Movant's debt. If the collateral were liquidated, that would decrease the debt owed by Enviromate, thereby decreasing the debt owed by Debtor. However, Movant has chosen not to liquidate the collateral, and has instead chosen to seek repayment from Debtor alone. This, when coupled with the fact that no evidence of the value of the Enviromate collateral was introduced at the hearing, means that this court is in no position to evaluate what effect the sale of the collateral would have on Debtor's ability to repay his debts. This court suspects that the collateral is not worth much considering that Movant has chosen not to liquidate it, but that is not evidence of value. Therefore, the Enviromate collateral was not considered by this court when determining whether Debtor has sufficient resources to pay his debts.

[14] This court is slightly incredulous at Movant's arguments to the contrary. Throughout this matter, Movant has argued that Debtor's failure to pay Movant is evidence of Debtor's bad faith. Movant loaned money to Enviromate and Debtor personally guaranteed that loan. If Debtor was to pay the debt owed to Movant, he would be paying the debts of insiders. Surely, Movant wouldn't argue Debtor was acting in bad faith if Movant had been the one receiving payments from Debtor

Case 12-80774-CMS7    Doc 75    Filed 12/07/12    Entered 12/07/12 12:51:13    Desc Main
Document      Page 10 of 17

by paying the debts of Enviromate, Debtor was paying his debts, as Debtor personally guaranteed the loans made to Enviromate. There is no evidence that Debtor is paying the debts of Enviromate postpetition.[15]

### 9. Do Debtor's schedules inflate expenses to disguise financial well-being?

No. Because Debtor did not attach a detailed itemization of the $2,625.00 in business expenses, there was some concern that Debtor had inflated theses expenses. Specifically, there was a concern as to why Debtor had such large business expenses for a private law practice when Debtor had not received any income from said law practice in roughly five years. Debtor explained that the bulk of the expenses are client development expenses as Debtor is trying to represent professional athletes and former professional athletes. In furtherance of this goal, Debtor will occasionally help these athletes out financially or he will help out people who know the athletes in hopes that they will refer business to Debtor. While the expenses are unconventional, this court believes them to be genuine.[16] In other words, this court does not believe that these expenses are disguised charity: Debtor genuinely believes that he might generate business by occasionally helping these people out financially. In fact, Debtor testified that he had been referred two large real estate deals by a former athlete, but he had to turn it down because it was too big for him to handle. Building up a law practice is a legitimate business expense. Debtor did not inflate the $2,625.00 business expense deduction he took on Schedule J.

### 10. Did Debtor transfer assets?

---

prepetition.

[15]Debtor testified that he continued to pay Progress Bank postpetition, but no evidence was introduced as to whether the debt owed Progress Bank was a debt of Enviromate.

[16]More conventional means of client development includes such things as taking clients/potential clients out for meals, giving away tickets to sporting events, hosting parties, and even allowing the use of vacation homes/condos. The purpose of these things is all the same: referrals and client development. This court believes that these more conventional means of client development are similar enough to Debtor's means, at least in spirit if not substance, that it will allow the expenses to be deducted.

11

No. There has been no allegation and this court has no evidence that Debtor transferred assets.

**11. Is Debtor over-utilizing the protections of the Bankruptcy Code to the unconscionable detriment of creditors?**

No. Debtor is not over-utilizing the protections of the Bankruptcy Code to the unconscionable detriment of creditors.

**12. Did Debtor employ a deliberate and persistent pattern of evading a single major creditor?**

No. Although Debtor testified that he filed bankruptcy to avoid a judgment being entered against him in the District Court action, this court does not believe he was trying to evade paying Movant. Debtor's testimony indicates that he has been searching for a way to pay Movant since Enviromate ceased operations. Debtor's testimony further indicates that Debtor did not want a judgment against him because he was concerned about his appointment as the Standing Chapter 13 Trustee, not because he thought he could avoid a finding that he owed Movant money. In addition, Debtor has cooperated with Movant since the filing of this bankruptcy. Movant filed a Motion for 2004 Examination on May 9, 2012. (Movant's Exhibit 7). On May 22, 2012, the parties entered into a Consent Agreement whereby they agreed that Debtor would produce documents to Movant by May 25, 2012, and would be available for examination on May 31, 2012. (Movant's Exhibit 7). Debtor produced various documents to Movant on May 24, 2012. (Movant's Exhibit 8). Movant cancelled the 2004 examination on May 30, 2012. Debtor has not employed a deliberate and persistent pattern of evading a single major creditor.

**13. Did Debtor fail to make candid and full disclosure?**

Yes. First, Debtor failed to list the potential recovery from Curtis Whitney Holdings as an accounts receivable/potential contingent claim. Debtor has been the attorney for Curtis Whitney

12

Holdings for three to four years.[17] (Movant's Exhibit 5). Tony Varner, the President of Curtis Whitney Holdings, is also an officer with the World Sports Alliance. (Movant's Exhibit 7). Curtis Whitney Holdings is the commercial capital manager of the World Sports Alliance. The World Sports Alliance is an international government organization ("IGO") that is certified by the United Nations ("UN") to operate as such. Debtor and Mr. Varner met in 2005 or 2006, and they worked on several "deals" together, including a "structural acquisition of waste-to-energy equipment" with the Democratic Republic of Congo and the Central Bank of Guinea ("African Projects"). Debtor provided legal support for these African Projects, and an agreement was ultimately signed with the Central Bank of Guinea for the necessary funding of the African Projects, though the funds have yet to be received. (Movant's Exhibit 7). Debtor has received no compensation from Curtis Whitney Holdings. Debtor has an understanding with Mr. Varner: if Curtis Whitney Holdings received any money as a result of the African Projects, Curtis Whitney Holdings would pay off the debt owed to Movant. (Movant's Exhibit 5). However, this agreement is a gentleman's agreement; there is no legally enforceable agreement for compensation. Debtor testified that he had little hope that he would receive any money from the African deal, although he did believe that if any money was paid to Curtis Whitney Holdings, he would receive compensation despite the lack of enforceable agreement. As such, Debtor should have listed this as a potential asset on Schedule B.

Second, the Schedule J filed with Debtor's bankruptcy petition is not completely accurate. As discussed in detail above, the $2,625.00 that Debtor took as a business expense deduction on Schedule J was not completely accurate. Debtor testified that the expense on Schedule J was just an estimate and that he meticulously went through his records after being questioned by Movant.

**14. Are Debtor's debts modest in relation to his assets and income?**

Yes. Debtor's gross income is $13,900.00 per month or $166,800.00 per year. Debtor owes $1,218,019.24 in general, unsecured debt. The large bulk of this debt is debt owed to Movant for

---

[17]Debtor is not an employee of Curtis Whitney Holdings. He just does work for them in a representative capacity. (Movant's Exhibit 5).

a loan to Enviromate that Debtor personally guaranteed. Debtor's total debt of $1,663,019.24 is more than 7 times Debtor's annual income. While this does not appear to be a modest ratio, Debtor is also the sole member of Enviromate, a corporation which owns a manufacturing plant and numerous manufacturing equipment. In addition, the manufacturing plant acts as collateral on Movant's loan. Although it appears that the collateral has a very small liquidation value, while running the collateral generated a large stream of income. Taking this large stream of income into account, this court finds that Debtor did not overreach when he decided to take out the Enviromate loans. Therefore, Debtor's debts are modest in relation to the assets and income he had at the time he incurred the debts.

**15. Did Debtor have multiple bankruptcy filings or other procedural "gymnastics"?**

No. This is Debtor's first bankruptcy case, and there have been no procedural "gymnastics."

## Should Debtor's bankruptcy case be dismissed?

Movant seeks dismissal of Debtor's Chapter 7 bankruptcy case pursuant to § 707(a). Section 707(a) provides, in pertinent part, that: "The court may dismiss a case under this chapter only after notice and a hearing and only for cause . . ." 11 U.S.C. § 707(a). "[T]he burden for showing cause is on the moving party." In re Simmons, 200 F. 3d 738, 743 (11th Cir. 2000). For purposes of this opinion, bad faith or lack of good faith constitutes "cause" as required by § 707(a).

"[Dismissal based on lack of good faith] should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." In re Zick, 931 F. 2d at 1129.

Bankruptcy courts have developed a list of factors relevant to the determination of whether a debtor has acted in bad faith. Generally speaking, one factor is not sufficient to dismiss a debtor's bankruptcy petition, but a combination of factors may be sufficient. In re Mazzella, No. 09-78449-

14

Case 12-80774-CMS7    Doc 75    Filed 12/07/12    Entered 12/07/12 12:51:13    Desc Main
Document      Page 14 of 17

478, 2010 WL 5058395, *6 (Bankr. E.D.N.Y. Dec. 6, 2010). As discussed in detail above, the following factors favor dismissal of Debtor's Chapter 7 bankruptcy petition: Debtor filed this bankruptcy petition to avoid a judgment being entered against him in the District Court action, and Debtor failed to make candid and full disclosure about the potential recovery from the African projects and the business expenses related to his private law practice.

The fact that Debtor filed for bankruptcy to avoid a judgment being entered against him in the District Court action is not enough to dismiss the case for cause under § 707(a). Although this court understands Movant's frustration at not getting paid prepetition, Debtor's explanation was reasonable and believable: he was paying those creditors that he could afford to pay and was diligently searching for a buyer for Enviromate so that Movant could be paid as well. Debtor even found someone who was willing to lease the manufacturing plant formerly used by Enviromate for 5 years at $8,000.00 per month, but the deal fell through.

Debtor further testified that he was worried about what would happen if a judgment was entered against him in the District Court action: Debtor is in an appointed position as Standing Chapter 13 Trustee in the Northern District of Alabama, and he was worried that a large judgment against him would endanger his position. That is a valid worry. In fact, Debtor has already faced serious repercussions: he no longer qualifies for a normal bond which costs $6,000.00 per year; he now only qualifies for a special bond which costs $34,000.00 per year. Debtor has been forced to pay $28,000.00 out-of-pocket in order to continue to be bonded, a requirement for his position as Standing Chapter 13 Trustee.

In short, the evidence indicates that although Debtor did file this bankruptcy petition to avoid a judgment being entered against him in the District Court action, such filing was not done maliciously or in bad faith. Debtor was seeking relief from a debt he could not hope to pay and decided that if he was going to file bankruptcy, he might as well file before a judgment was entered against him. There is no indication that Movant has suffered any prejudice or unfairness by Debtor's bankruptcy filing beyond that suffered by any other creditor subject to the automatic stay. In re

15

Mazzella, 2010 WL 5058395, at *6.  In addition, Debtor has accepted "the statutory duties of financial disclosure, cooperation with the trustee, and surrender of non-exempt assets." In re Kahn, 172 B.R. 613, 625 (Bankr. D. Minn. 1994).  Debtor has cooperated fully with Movant and Trustee since the filing of this bankruptcy petition.

In addition, Debtor should have listed the money he hopes to receive as a result of his prepetition work on the African Projects as a potential asset/contingent claim on Schedule B.  While it is true that Debtor has little hope the money will come to fruition, and there is no legally binding agreement that Debtor can enforce if he does actually receive money from Curtis Whitney Holdings, it was clear from the testimony that Debtor truly believes that he will get paid if Curtis Whitney Holdings get paid.  Debtor should have disclosed this potential source of income on his bankruptcy petition.  The extreme unlikelihood of payment should have been reflected in a small, maybe even nonexistent, value assigned to the claim, rather than a failure to list such claim on Schedule B.

In addition, Debtor should have carefully examined his business expenses before listing them on Schedule J and filing them with this bankruptcy petition.  Although Debtor should have done a more thorough job itemizing his business expenses, it acts in his favor that his business expenses on Schedule J were underestimated rather than overestimated.  As such, the failure to carefully examine is fairly attributable to sloppiness in the preparation of the schedules and not from any desire to obscure actual financial health from this court.

All of the evidence suggests that Debtor filed this bankruptcy case because his business failed and he could not afford to continue to pay his business creditors.  This is not uncommon, and it certainly is not bad faith.  Although this court does wish that Debtor had taken the time to look at his actual expenses before filing this petition and had disclosed his potential recovery from Curtis Whitney Holdings, these factors together just do not rise to the level of bad faith.  The evidence just does not show that this is one of "those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." In re

16

Zick, 931 F. 2d at 1129. Therefore, this court finds that Debtor has not acted in bad faith, and cause does not exist to dismiss Debtor's case pursuant to § 707(a).

## CONCLUSION

The evidence indicates that Debtor has not acted in bad faith. Therefore, there is no cause to dismiss this case pursuant to § 707(a). As a result, the Movant's Motion to Dismiss is **DENIED**. Debtor's Objection to the Motion to Dismiss is **SUSTAINED**.

**DONE and ORDERED** this December 7, 2012.

/s/ C. Michael Stilson
C. Michael Stilson
United States Bankruptcy Judge

17